727 So.2d 518 (1998)
STATE of Louisiana
v.
Leon C. BURTON and Percy L. Hawthorne.
No. 96-KA-1248.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1998.
Writ Denied April 30, 1999.
Harry F. Connick, District Attorney, Val M. Solino, Assistant District Attorney, New Orleans, LA, Attorneys for Plaintiff-Appellee State.
Archie B. Creech, Orleans Indigent Defender Program, New Orleans, LA, Attorney for Defendant-Appellant Leon C. Burton.
W. Robert Gill, Manasseh, Hildum & Gill, P.L.C., Baton Rouge, LA, Attorney for Defendant-Appellant Percy Hawthorne.
Court composed of Judge ROBERT J. KLEES, Judge STEVEN R. PLOTKIN and Judge JAMES F. McKAY, III.
*519 KLEES, Judge.
On February 9, 1995, defendants, Leon C. Burton and Percy L. Hawthorne, were indicted on two counts of first degree murder in violation of La. R.S. 14:30(1). In count one, the defendants were charged with the first degree murder of Stephen Hall during the perpetration or attempted perpetration of an armed robbery. Count two charged defendants with the first degree murder of Phil Thomasson during the perpetration or attempted perpetration of an armed robbery. At their arraignment on February 16, 1995, the defendants entered pleas of not guilty to both counts. Discovery and suppression motions were filed on February 23, 1995. Defendants filed motions for a lunacy commission on April 6, 1995. Drs. Mallik and Deland were appointed to the lunacy commission. After a lunacy hearing on May 23, 1995, both defendants were found competent to stand trial. On the same date, the state amended the bill of indictment to read "armed robbery" instead of "carjacking." The defendants entered pleas of not guilty to the amended bills. On February 1, 1996, the defendants filed motions to sever. The trial court denied the defendants' motions to sever. The defendants sought supervisory review from this court. On February 6, 1996 in writ 96-K-0284, this court denied the defendants' writ application. Thereafter, the defendants filed supervisory writs with the Louisiana Supreme Court. The Supreme Court, on February 7, 1996, in writ 96-KK-0333, denied the defendants' writs. On February 9, 1996, after a five day jury trial, defendant Burton was found guilty as charged on both counts. Defendant Hawthorne was found guilty as charged on count one and guilty of second degree murder on count two. The penalty phase of the trial began on February 10, 1996. However, the jury was unable to unanimously agree on the sentences to be imposed. At the sentencing hearing held on February 29, 1996, the defendants filed motions for post verdict judgment of acquittal and motions for new trial. All motions were denied by the trial court. Both defendants waived delays. The trial court sentenced both defendants to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count one. Both defendants were also sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count two. Each defendant's sentences were to be served consecutively. On March 6, 1996, the trial court granted defendants' motions for out of time appeals. The appeal record was lodged in this court on May 30, 1996. Supplements to the record were filed on January 6, 1997 and April 16, 1997. Defendant Hawthorne's brief was filed on April 11, 1997. The state filed its response to Hawthorne's brief on May 30, 1997. Defendant Burton's brief was filed on December 18, 1997. The state filed its response to Burton's brief on January 21, 1998. On April 30, 1998, defendant Hawthorne filed "Permission to file Supplemental Brief in Pro Se"which was granted April 30, 1998.
On June 9, 1998, this court received a letter from Hawthorne acknowledging receipt of "the majority of my court documents" but requesting:
"1. Transcript of what transpired in my trial sentencing phase on February 11, 1996 testimony." "2. Trial Transcript."
On October 9, 1998 this court received a letter from Hawthorne acknowledging receipt of the majority of court proceedings but specifically requesting page 409 of the trial transcript, a copy of jury charges and a copy of closing arguments. This request was denied on November 12, 1998 and Hawthorne was granted a final fifteen days to file his supplemental brief. No brief was filed when due.
On January 3, 1995, New Orleans Police Officer Terry DeMesme responded to a call of an aggravated battery in the 2600 block of Erato Street. When he arrived, he did not see a victim or crime scene. He drove around the area and observed a man lying face down in a vacant lot in the 1200 block of South Robertson. When the officer approached the man, he observed the man was bleeding profusely from the head. The officer immediately called for an EMS unit. The officer observed a walking cane lying next to the man. Photographic identification on the subject identified the man as Arthur *520 Thomasson. No money was found on the man. Once the EMS unit arrived, they transported Thomasson to Charity Hospital. Officer DeMesme spoke with Lawrence Henry who stated that he heard gunshots and called the police. Henry told the officer that he saw a white car speeding from that location.
Wallace Daniels, a member of the Progressive Baptist Church which is located at 1214 South Robertson Street, was leaving the church around 7:00 p.m. on January 3, 1995, when he saw a white vehicle speed out of a vacant lot owned by the church. The driver of the vehicle was an African-American man.
Lawrence Henry was crossing the vacant lot in the 1200 block of South Robertson when he saw a white car pull into the lot. There were three people in the vehicle. Henry heard two gunshots and then saw the car drive out of the lot. Only two people were in the vehicle went it left. Henry went to a neighbor's house and called the police. He could not identify the two people in the vehicle. Henry knew Hawthorne and Burton but could not say if they were in the car as it was too dark to identify the people.
Dr. Susan Garcia, a forensic pathologist, performed an autopsy on Phil Thomasson. Thomasson's time of death was noted to be 11:19 p.m. on January 3, 1995. Dr. Garcia testified Thomasson suffered two gunshot wounds to the back of the head. One gunshot wound went completely through and exited the scalp. The other gunshot wound injured the brain. The bullet from this wound was recovered from the left side of the eye bone. This gunshot wound, which injured the brain, was fatal and caused the victim's death.
New Orleans Homicide Detective Louis Berard investigated the murder of Phil Thomasson. A few days after the murder, Berard returned to the crime scene. He observed dried blood on the ground and found two spent .32 caliber casings. Berard also spoke with Lawrence Henry. Henry told him that there were three men in the vehicle. All three got out of the car. Only two returned to the vehicle. After he heard the gunshots, Henry walked to the lot and saw the victim. He then called the police. From his investigation, Berard was looking for two young African-American men and a late model white vehicle, possibly a Buick. The officer assumed Thomasson had been the victim of a carjacking. He contacted several car rental agencies in New Orleans. He learned that the victim had rented a vehicle from Enterprise Leasing on January 3, 1995. The vehicle was eventually recovered and processed. However, no fingerprints were found on the car. The officer also found a cash withdrawal form on the victim which indicated the victim had withdrawn money from his bank account. No money was found on the victim.
Arthur Taylor, an employee of Enterprise Leasing, testified that Phil Thomasson rented a Buick Skylark on January 3, 1995 at approximately 5:30 p.m. Taylor last saw Thomasson driving the vehicle on Canal Street towards the river. Melanie Goodyear, a loss control manager with Enterprise Leasing, stated Enterprise was notified on January 14, 1995, that the vehicle was recovered. The vehicle was found in the 2100 block of LaSalle Street. Ms. Goodyear stated there was blood inside the vehicle when it was returned to Enterprise. There were no other damages to the vehicle.
Cindy Hall, the wife of Stephen Hall, testified she spoke with her husband at approximately 4:00 p.m. on January 13, 1995. He was planning to leave work at 5:30 p.m. and would be home for 6:00 p.m. When Stephen did not arrive home at 6:00 p.m., she dropped her children off at a skating party and went to look for her husband. She drove by the parking lot where he parked his vehicle but she did not see him or the vehicle. When she could not find him, she called one of his co-workers to see if there had been an emergency at work. The co-worker told her that Stephen had left the office. She then called the police.
Greg Guita, a paralegal for a local law firm, was walking on Perdido Street to Civil District Court at approximately 4:00 p.m. on January 13, 1995. As he approached the intersection of Perdido and South Rampart, he observed three young African-American men walking on the opposite side of the *521 street. They appeared to be arguing. All three of the young men wore dark colored starter jackets. In a photographic lineup, Mr. Guita identified Hawthorne as one of the young men he observed on January 13, 1995. At trial, Mr. Guita stated that Bruton looked like one of the men he saw on January 13, 1995.
Sam Rodrigue and Ernest Johnson, employees of Carlo Ditta (a cement company), were working near the Convention Center on January 14, 1995. On the morning of January 14, 1995, they discovered the body of Stephen Hall lying between two eighteen wheel trucks in a truck lot next to the Convention Center. They thought the victim was homeless and asleep. When they realized the victim was dead, Rodrigue called the police.
Dr. Paul McGarry, a forensic pathologist, performed an autopsy on Stephen Hall. Dr. McGarry testified the victim died from a gunshot wound to the back of the head. It was a contact wound with heavy soot staining and splitting the skin, which is indicative that the muzzle of the gun was held against the victim's head when the gun was fired. The bullet was retrieved from inside the brain.
John Treadway, a firearms examiner with the New Orleans Police Department's Crime Lab, examined the bullet retrieved from Hall's body. The bullet was a .38 caliber which was probably fired from a .38 or .357 revolver. Officer Treadway also examined the bullet and casings found in the 1200 block of South Robertson. The bullet and casings were .32 caliber.
Officers Raymond Griffin and Wallace Simpson were patrolling the area of Baronne and Martin Luther King Boulevard at approximately 4:30 p.m. on January 14, 1995. When they turned onto Baronne, they observed a blue or grey colored van driving in the wrong direction on Baronne. They proceeded to pull the van over. After the officers exited their vehicle, Simpson went to the passenger side door and Griffin walked to the driver side door. There were three African-American males in the van. The passenger in the back seat of the van got out of the van and starting running. Griffin pursued the subject while Simpson stayed by the van. The subject, who was wearing dark pants and an orange and green jacket, ran up Euterpe towards Dryades Street. Griffin chased the subject to Dryades Street but the subject eluded the officer. Upon returning to the van, Griffin learned that the van was stolen. The two other subjects, Leon Burton and Rufus Jefferson (a juvenile), were arrested. Burton was the driver of the vehicle.
John Casey lived at the Shepard's Flock Shelter in January of 1995. The shelter is located at 1631 Baronne Street. On January 14, 1995, he was sitting outside the shelter with some of the shelter's clients when he noticed a number of police vehicles in the area. He then saw an Afro-American man running from Baronne Street onto Euterpe towards Oretha Castle Haley Boulevard. A short Afro-American police officer was pursuing the man. The witness identified the subject who was being chased by the officer as Hawthorne. Casey testified he knew Hawthorne from the neighborhood. He identified Hawthorne in a photographic lineup and at trial.
Detective John Ronquillo investigated the murder of Stephen Hall. When he arrived at the scene, he observed the victim had a gunshot wound to the back of his head. He searched the crime scene for evidence. Three latent fingerprints were found in the area but they could not be matched. Later, the officer learned that Hall's van had been found and two subjects, Leon Burton and Rufus Jefferson, arrested. After his arrest, Burton was taken to the Homicide Office. Ronquillo advised Burton of his rights. Burton waived his rights and gave a taped statement. Burton admitted that he and Hawthorne had robbed Hall but stated that Hawthorne shot Hall. After Burton identified Hawthorne in a photographic lineup, Ronquillo prepared an arrest warrant for Hawthorne. Hawthorne was arrested on January 18, 1995, and taken to the Homicide Office. Ronquillo met with Hawthorne and advised him of his rights. Hawthorne waived his rights and gave a taped statement implicating himself and Burton in the robbery. However, Hawthorne stated Burton was the person who shot Hall.
*522 Burton stated that on January 13, 1995, he and Hawthorne were walking around the Greyhound Bus station when they saw Stephen Hall walking to his vehicle. Hawthorne pulled out a gun and told Hall to get into the van. Hall was told to lie down in the back of the van. Hawthorne drove around and then pulled into a truck lot near the Convention Center. While they were driving, Hawthorne took Hall's wallet from Hall. When they pulled into the lot, Hawthorne told Hall to get out of the vehicle. Hall and Hawthorne got out of the vehicle and walked short distance from the vehicle. Burton, who stayed in the van, then heard one gunshot. Hawthorne returned and they left the truck lot in the van. Hawthorne had a black revolver that night.
In his statement, Hawthorne indicated that he and Burton saw Hall in his vehicle. Burton pulled out a gun and told Hall to get in the back of the van. Burton also demanded Hall's wallet. Hawthorne drove the van, and Burton was in the front passenger seat. When they arrived at the truck lot, Burton gave Hawthorne the gun, a black revolver, and told Hawthorne to shoot Hall. Hawthorne said he was not going to shoot the man. Burton told Hall to get out the van. Burton walked a short distance with Hall, and Hawthorne returned to the vehicle. While Hawthorne was in the van, he heard one gunshot. When Burton came back, he told Hawthorne he shot the man's head off.
Homicide Detective Marco Demma, Jr., assisted in the Thomasson murder investigation. On January 18, 1995, he learned of Hawthorne's arrest in the Hall murder. The officer spoke with Hawthorne at approximately 6:15 p.m. on January 18, 1995. Demma informed Hawthorne that he was a suspect in the Thomasson murder and read Hawthorne his rights. Hawthorne signed the waiver of rights form, waived his rights and gave a taped statement. In his statement, Hawthorne admitted to robbing Thomasson but implicated Burton as the person who shot Thomasson. Later that evening, the officer took statements from Christopher Jones and Tammy James. On January 19, 1995, the officer spoke with Burton. Demma advised Burton of his rights and asked if Burton would make a statement. Burton waived his rights and gave a taped statement. Burton admitted to robbing Thomasson but stated that Hawthorne had shot the victim.
Hawthorne stated that they saw Thomasson getting into his car. When they approached Thomasson, Burton pulled out a gun and Hawthorne told him to get into the back of the car and lie down. Hawthorne drove the vehicle to the 1200 block of South Robertson. When they pulled into a vacant lot, Burton told Thomasson to get out. Hawthorne was in the car when he heard a gunshot. Hawthorne got out of the car and went to see what was happening. Thomasson was lying on the ground pleading for his life. Hawthorne told Burton not to shoot the man and returned to the car. Shortly thereafter, Hawthorne heard another gunshot.
Burton and Hawthorne were walking around the Greyhound Bus Station when they saw Thomasson walking to his vehicle. According to Burton, Hawthorne ran and grabbed the man. Hawthorne told Thomasson to get in the back of the car and lay down. Hawthorne drove the car to the 1200 block of South Robertson. When they pulled into a vacant lot, Hawthorne told Thomasson to get out. After they had gotten out of the car, the gun went off accidently and Thomasson fell. Hawthorne then shot the victim again. Hawthorne used a .32 caliber automatic to shoot the victim. Hawthorne took the victim's money and watch.
Timothy Seuzeneau, a forensics light examiner with the New Orleans Police Department's Crime Lab, processed Hall's van for fingerprints. He found several fingerprints from the windows, interior and exterior of the van. One partial latent print was identified as belonging to Burton. The fingerprint was lifted from the exterior of the front driver's window. Glenn Burmaster, of the New Orleans Police Department's Fingerprint Section, testified that he matched the latent print to Burton. However, he was not able to match any fingerprints to Hawthorne.
New Orleans Police Officer Ed Perkins assisted in the arrest of Percy Hawthorne on January 18, 1995. Perkins and other members of the Special Operations Division were *523 called to assist as defendant was classified as a "high risk" warrant. Hawthorne was arrested at 3821 Gibson Street. The defendant was found hiding underneath a bed. Hawthorne had to be physically removed from underneath the bed. Hawthorne cut his chin on a bedspring.
Tammy James and her boyfriend, Christopher Jones, lived at 3821 Gibson Street. James knew both defendants through her boyfriend. Hawthorne would occasionally stay at her house. He was arrested at her house on January 18, 1995. James testified that she saw the two defendants together on January 3, 1995. They were driving a white vehicle. James overheard Burton talking to her boyfriend and some other men. She heard him say that he and Hawthorne picked up a white man from a bus station, drove the man to a lot, got out of the car and shot the man. Burton stated the man had a walking cane. Burton also said he shot the man because the man saw his face.
Christopher Jones testified the defendants arrived at his house on January 3, 1995 at between 7:30 p.m. and 8:00 p.m. driving a white Buick Skylark. Burton was driving the car. Jones identified the vehicle leased from Enterprise by Thomasson as the vehicle Burton was driving that night. Hawthorne told the witness that he and Burton were walking by the Greyhound Bus Station when they saw a white man getting into a car. Burton pulled a gun and told the man to lie down in the car. They drove around to the other side of the project and told the man to get out. Hawthorne stayed in the car. Burton walked with the man to a vacant lot and shot the man twice. Burton told Hawthorne he shot the man because the man looked at his face. The witness observed Burton had a.32 automatic weapon with him on the night of January 3, 1995. Burton said he got the gun from his grandmother's house. He left the gun in a rock house in the Melpomene Project. Burton also stated the victim walked with a cane. A few days later, the witness saw Burton and Hawthorne riding in a van. Burton told the witness they got the van from a man they saw walking in the Central Business District. Burton and Hawthorne put the man into the van and drove around for a while. Burton stated he shot the man in an area close to the Convention Center. Hawthorne was in the van when Burton shot the man. Burton had a revolver in his possession when the witness saw him that day. The witness acknowledged prior convictions for possession of cocaine and battery.

A. Errors Patent

A review of the record for errors patent reveals none.

B. Burton's and Hawthorne's First Assignments of Error

In these assignments, the defendants contend the trial court erred when it denied their motions to sever. Defendants argue that since they had antagonistic defenses, the trial court should have granted their motions and required the state to try each of them separately. La.C.Cr.P. article 704 provides:
Jointly indicted defendants shall be tried jointly unless:
(1) The state elects to try them separately; or
(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether to grant or deny a severance is within the trial court's sound discretion and will not be disturbed absent clear abuse. State v. Prudholm, 446 So.2d 729, 741 (La.1984). The standard for a pre-trial severance is broader because of speculation as to what the evidence will be, whereas the standard for severance after trial commences is stricter because the judge can examine the evidence. State v. Fleming, 574 So.2d 486, 492 (La.App. 4th Cir.1991), writ den. 592 So.2d 1313 (La.1992). Under the "antagonistic defenses" test a severance is mandated when each defendant intends to blame the other and a joint trial would require the defendants to defend against the state and each other. State v. Prudholm, 446 So.2d at 741. See La.C.Cr.P. art. 704, comment (c). When each confession or statement involves both defendants as principals and only the extent of participation is contradictory, the *524 defenses are not antagonistic and the degree of blame each defendant seeks to cast on the other does not warrant a severance. State v. Williams, 416 So.2d 914, 916 (La.1982); State v. Simmons, 381 So.2d 803, 806 (La. 1980), cert. den., Simmons v. Louisiana, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 498 (1980).
In State v. Simmons, supra, the jointly charged defendants were convicted of first degree murder. The Supreme Court held that although each defendant's statement blamed the other for the shooting, the defenses were not antagonistic because each confession involved the other defendant as a principal. Only the degree of participation was contradictory. The Court concluded that the "degree of blame each [sought] to cast upon the other [did] not suffice to warrant severance." Simmons, 381 So.2d at 806. The Supreme Court, in State v. Gaskin, 412 So.2d 1007, 1012 (La.1982), stated in dicta that "(j)ustice does not require a severance where only the extent of participation of each defendant is at issue." A principal is defined as one who is "concerned in the commission of a crime, whether present or absent, and whether [he] ... directly commit[s] the act constituting the offense, aid[s] and abet[s] in its commission, or directly or indirectly counsel[s] or procure[s] another to commit the crime." La. R.S. 14:24.
In the present case, the defendants were charged with two counts of first degree murder. First degree murder is defined as the "killing of a human being ... when the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of... armed robbery." La. R.S. 14:30. Both defendants admitted to their participation in the crimes but implicated the other as the person who shot the victims. They stated that they abducted each victim as the victim was entering his vehicle. They then drove around in the victim's vehicle, taking the victim's wallet and/or jewelry. Once they had robbed the victims, they drove to a secluded area and shot the victims. Their statements reveal they were both willing participants in the robberies and murders of the victims. Their statements indicate that both defendants were principals in the murders of the victims. As in Simmons, the only difference in their statements is that each sought to shift the blame by implicating the other as the shooter. Defendants' defenses were not truly antagonistic since their own statements revealed their involvement as principals in the victims' murders. The trial court did not abuse its discretion when it denied the defendants' motions to sever.
This assignment is without merit.

C. Burton's Second Assignment of Error

Burton also argues that the trial court erred in allowing Hawthorne's statement into evidence as it denied him his right to effectively confront and cross-examine a witness in violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution.
In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court reversed the robbery conviction of a defendant who had been implicated in the crime by his co-defendant's confession. Because the co-defendant had not taken the stand at the joint trial and thus could not be cross-examined, the court held that admission of the co-defendant's confession had deprived the defendant of his rights under the confrontation clause. However, the admission of a confession of a codefendant is not error when the defendant's own confession was also introduced into evidence and it "interlocked" or was substantially identical with the confession of his codefendant. Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979); State v. McSpaddin, 341 So.2d 868 (La.1977). In State v. Murphy, 463 So.2d 812 (La.App. 2nd Cir.1985), writ denied, 468 So.2d 570 (La.1985), the two defendants' confessions were substantially identical. The confessions only conflicted as to which defendant held the gun. The court found that this fact was not substantially relevant in that each defendant would be equally guilty as principals. The defendant's confession interlocked with his co-defendant's confession thus rendering both confessions admissible.
*525 In his statements, Hawthorne admitted to his participation but implicated Burton as the shooter. Likewise, Burton admitted to his participation but stated that Hawthorne shot the victims. The defendants' statements were substantially similar. The only conflict concerned who actually shot the victims. Thus, as in Murphy, Burton's and Hawthorne's confessions interlocked rendering Hawthorne's statements admissible.
This assignment is without merit.
Accordingly, for the foregoing reasons, the convictions and sentences of defendants Leon C. Burton and Percy L. Hawthorne are hereby affirmed.
AFFIRMED.