|, ARMSTRONG, Judge.
This case is before us on the defendant’s application for writs from the trial court’s denial of his application for post-conviction relief. We affirm.
The defendant and two codefend-ants/brothers, Stanley Thomas and John Thomas, were charged with first degree murder. A jury found Michael Thomas guilty of second degree murder, a violation of R.S. 14:30.1. Stanley Thomas and John Thomas were found guilty of manslaughter, violations of R.S. 14:31. The trial court sentenced Michael Thomas to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Stanley Thomas was sentenced to ten years at hard labor, and John Thomas was sentenced to five years at hard labor. On appeal this Court affirmed. State v. Thomas, 620 So.2d 469 (La.App. 4 Cir.1993), writ denied, 625 So.2d 1062 (La.1993). According to the docket master, on May 31, 1996 defense counsel filed an application for post conviction relief. On February 25, 1997 the trial court ordered the State to file any procedural objections and a response to the claims. On April 30, 1997 the trial court in Section “A” recused itself. The case was re-allotted to Section “L”. On 12October 24, 1997 the trial court denied the motion as to jury instructions; the defendant objected and asked for an evidentiary hearing.
On November 14, 1997 the trial court recused itself, and the matter was re-allotted to Section “F”. On January 16, 1998 the trial court denied the application, and the defendant objected. On December 29, 1998 the hearing was held. On April 16, 1999 the trial court denied the application.[1] The defendant now comes before this court seeking relief from that ruling.
The following facts are taken from this Court’s opinion in the defendant’s appeal:
On New Year’s Eve 1990, Joyce Brumfield, her husband Stanley Brum-field, their daughter Nicole, and Nicole’s friend Demetrius Franklin were watching a Saints game at the Brumfields’ home. At the conclusion of the game, which the Saints won, they went outside to celebrate by shooting off firearms. Mr. Brumfield and Demetrius discharged shotguns while Mrs. Brumfield fired a one shot derringer. The four then went back inside the house. Shortly thereafter they heard gunshots outside. They looked outside and saw one of the defendants, Michael Thomas, pulling off in his black Camaro. A car belonging to a relative of Demetrius, which he had been using, had bullet holes in it. After unsuccessfully trying to call the police, Demetrius drove to the Sixth District to report the incident but was told to return in the morning to make a complaint because they were short handed. Demetrius returned to the home of the Brumfields who decided *1118 to drive across the river, to Algiers, to the home of Michael Thomas to talk to his mother about the incident. They took the shotguns with them in the vehicle, a Chevrolet Suburban. Mrs. Brum-field had her derringer in her pocket because she had forgotten about it. When they arrived on Bermuda Street where the Thomases lived, Demetrius Franklin, the driver of the Suburban, parked around the corner from the Thomas house. According to Mrs. Brumfield, they parked around the corner because they were scared. According to Nicole Brumfield and Demetrius Franklin, they parked around the corner because there were no parking spaces in front of the Thomas house. Demetrius and Nicole stayed in the Suburban while Joyce and Stanley Brumfield went up to the house. As they reached the door, Joyce remembered she had the pistol and | ¡¡handed it to Stanley who put it in his pocket.
The Brumfields knocked on the door for a few minutes until it was answered by one of the defendants who did not open the door or screen. Joyce Brum-field was unable to identify which brothT er it was. The Brumfields identified themselves as Nicole’s parents; Nicole and Michael Thomas had gone to school together. For a few minutes the Brum-fields argued about the fact that Michael had shot up the car and asked to see the defendants’ mother. Finally the Brum-fields turned, left the porch, and were getting ready to walk away when Michael Thomas came out with a “long” gun; the other brothers also came out with guns. Stanley Thomas, armed with a “long” gun, put it in Stanley Brum-field’s face and told them to get away from the area. The Brumfields then began backing up until they turned the corner at which time Joyce Brumfield heard a gunshot. As she was getting into the Suburban, she heard rapid gunfire. Stanley Brumfield was shot while he was getting in the vehicle; Nicole, Joyce, and Demetrius Franklin were struck by bullets when they were already in the vehicle. After the shots were fired, Demetrius pulled off, with Stanley Brumfield still partially out of the car, and drove across the Mississippi Bridge to Charity Hospital. At Charity, it was discovered that Stanley Brumfield had died. The cause of death was determined tó be gunshot wounds that entered the back of his body. Nicole Brumfield had been Shot in the head, necessitating surgery to remove the bullet and resulting in her having a frontal lobotomy.
At trial Ronald Ruiz, Jr., Ronald Ruiz, Sr., and Ann Ruiz testified about the shooting. The Ruizes lived next door to the Thomas family. Ronald Jr., age thirteen, testified that at approximately 12:30 a.m. a woman went to the Thomas house and asked for Michael. Ronald was looking through the window as the man and woman on the Thomas porch talked to a man, who sounded like Michael Thomas. The Brumfields kept asking why their house had been shot up; Michael said he did not do it and to get off the porch. Finally the Brum-fields backed down and went around the corner. Ronald stated that he did not see the shooting but did hear a single shot, then shots like a pack of firecrackers.
Mrs. Ruiz testified that she heard an argument at the Thomas house, looked out of the window, and saw the three Thomas brothers. One of them was in the middle of the street with a gun. She saw a flash from the gun when it went off, then all three brothers went down the street. Mrs. Ruiz was unable to say which brother shot the gun first but that it looked like the smallest. After the first shot, Mrs. Ruiz ran to call 911.
Mr. Ruiz Sr. heard and saw the argument on the Thomas porch. He saw the Brumfields back down the step and walk down the street around the corner until they were out of sight. The Thomas brothers came out of the house; Michael went into the street, raised his hand’and *1119 fired a gun. The other two brothers then raised their hands up. As Mr. Ruiz and his wife went to the phone to call the police, they heard multiple gunshots.
When the police responded to the phone call from the Ruizes, Officer Louis Martinez of the New Orleans Police Department initially arrived on the scene and interviewed the Ruizes. While he was interviewing them, Ronald Jr. noticed a black and gold Camaro, which he identified as Michael’s car, pull up. Ronald pointed the car out to Officer Martinez who pursued it for five or Lsix minutes until it stopped. Officer Martinez saw three weapons on the dash board of the car. Michael, who had been driving, got out and was frisked by Officer Martinez. Officer Martinez discovered that Michael was wearing a bullet-proof vest. Stanley Thomas made a brief statement to Officer Martinez that at approximately 12:15 some unidentified people approached his residence and began firing at him, and he returned gun fire to protect himself. Officer Martinez subsequently conducted a search, with the consent of Bobbi Thomas, the defendants’ mother. With her cooperation Officer Martinez discovered an AK-47 under a bed in the Thomas home.
Stanley later made a statement to Homicide detective Cindy Patterson in which he stated that there had been a knock on his door, he answered it, and found an unknown black male on the porch who started shooting at him. Stanley and his brother John then armed themselves and came out and shot at the person, who ran into a car that was parked across the street. As the car pulled off, Stanley and John chased them.
The defendants did not testify at the trial in this matter. The defense did present evidence regarding a shooting incident at the Thomas home in November 1990, approximately thirty days pri- or to the instant offenses. Bobbi Thomas testified that on November 27th she heard loud knocking on her door. A voice inquired as to whether “June” was there, then “Stan”, then Stanley. Ms. Thomas awoke her son John and told him that someone was at the door acting strangely. John told Ms. Thomas to get her gun, then he went to the front door with it. Ms. Thomas went to the back of the house to call the police at which time she heard gunshots. She later discovered bullet holes in the front of her house. Officer A1 Bowman testified that on November 27, 1990 he was working a paid detail on Elisa Street, approximately two blocks from Bermuda street where the Thomases lived, when he heard several gunshots. He called the incident in on his police radio then ran to the intersection of Elisa and Bermuda where he saw three armed people in the intersection shooting at the Thomas house. One of the men fired at Officer Bowman; the perpetrators were arrested shortly thereafter a few blocks away. A search of the car in which the men were apprehended revealed two jugs of gasoline and matches as well as several guns. One of the guns recovered, a shotgun, was registered to Demetrius Franklin who testified that it had been stolen from him.
State v. Thomas, 620 So.2d at 470-71.
The defendant lists seven claims, which are:
1) The fact that favorable information withheld by the State violated the prosecutor’s duty to disclose and relieved the State of its burden of negating self defense;
2) The defendant was denied effective assistance of counsel at pre-trial hearings and at trial;
3) The defendant was denied effective assistance of counsel on appeal;
Is4) The joint trial with his two brothers/codefendants denied him of his right to present a defense and to call his brothers as alibi witnesses;
*1120 5) The trial court’s jury instruction as to “collective” specific intent was erroneous;
6) and 7) The defendant was denied effective assistance of counsel due to his counsel’s conflict of interest.
At the December 29, 1998 hearing on the defendant’s application for post conviction relief, Bobbie Thomas, the mother of the three co-defendants, testified that she hired Rick Kohnke to represent her three sons. Mr. Kohnke called her one evening and informed her that he could no longer represent Michael because of his prior arrest record. Mr. Kohnke said that he had hired an attorney to represent Michael, Donald Pinkston. She met Mr. Pinkston only once. She paid him $3,000 separate from Mr. Kohnke’s fee. She knew nothing about Mr. Pinkston.
Stanley Thomas testified that Mr. Kohnke represented the three brothers from the beginning. Then one night he told Stanley that he could no longer represent Michael. Mr. Kohnke said that he would have to paint Stanley and John as lily white and separate them from Michael. Mr. Kohnke said that he would bring in another attorney to represent Michael. Stanley saw Mr. Kohnke that night and once more for trial preparation when he brought Mr. Pinkston as well. Stanley was scheduled to testify, but then Mr. Kohnke decided that Stanley should not take the stand. Stanley further testified at the hearing that he and John were at home the night that Stanley Brumfield was shot. He spoke to Michael, who was living next door, at about 8:00 p.m. and again at about 11:00 p.m. Stanley did not see Michael leave the house that night. He had told Mr. Kohnke that Michael had been at home that night; Mr. Pinkston never asked Stanley about Michael’s whereabouts. Stanley stated that Mr. Pinkston represented all three brothers on appeal. Stanley | fisaid that he saw no collaboration between Mr. Kohnke and Mr. Pinkston during trial. He answered affirmatively when he was asked whether there were times when Mr. Kohnke told Mr. Pinkston to withdraw a question he had asked especially when Nicole was being questioned.
On cross-examination Stanley stated that he was convicted of manslaughter and sentenced to ten years. His only other conviction was for credit card fraud. On the night of the shooting he lived on one side of a shotgun double; Michael lived on the other side. Stanley said that he used an AK-47 to shoot at Stanley Brumfield and the other victims. John had a .380 caliber gun, and Michael had a nine millimeter gun. Stanley said that he did not know the person who shot Stanley Brum-field twice in the back, Nicole Brumfield in the head, Joyce Brumfield four times in the back, and Demetrius Franklin in the hip. Stanley conceded that he and his brothers were not shot that night. Stanley conceded that Michael was wearing a bullet proof vest when he and his brothers were arrested in a car. Inside the car officers found three automatic weapons, and inside Stanley’s residence the officers found an AK-47 and an ammunition box. Stanley said that the AK-47 belonged to John. Stanley stated that Michael had expressed dissatisfaction with Mr. Pinkston’s representation of him. Every time Mr. Pinkston stood up to object, Mr. Kohnke told him not to object. During a break Stanley asked Mr. Kohnke about the strategy. Mr. Kohnke said that he did not want the prosecutor to get “upset and come gunning for you all.” Stanley explained a statement he made to Detective Patterson in which he said that Michael was not with him and John at the shooting; he meant at the first shooting at the Brumfield house, not at his house. He denied a conversation with Billy Dick in which he said |7that he would have Ann Ruiz, the next door neighbor who testified against the Thomas brothers at trial, in a body bag.
Donald Pinkston testified that Rick Kohnke contacted him about helping out with a murder ease. Mr. Kohnke told him to represent Michael Thomas. Mr. Pink-ston said that he obtained most of his *1121 information from Mr. Kohnke. He met with Mr. Kohnke periodically to discuss any new evidence. He only met with Michael Thomas once or twice; he did not meet Michael individually. He said that he never received a copy of Stanley’s statement that only he and John were involved in the shooting. He had intended to put Stanley and/or John on the stand to testify that Michael was at home with them on the night of the Brumfield shooting. When the State rested, he learned that Stanley was not going to take the stand. Two to three nights before trial, he questioned the nurses at the hospital and learned that Stanley Brumfield had a .22 caliber gun upon his arrival there. He never knew that Michael’s bullet-proof vest had a .22 caliber bullet in it, and that information did not come out at trial. Mr. Pinkston said that Mrs. Thomas had told him that Mr. Ruiz, the neighbor, had made a statement that the old man (Brumfield) had shot once; neither of the brothers told him about that statement. He was not aware that Mr. Ruiz had made that statement to the police. Mr. Pinkston conceded that he was aware that a gunshot had been fired out of the car window. He was under the impression that there had been shooting back and forth between the Brumfield vehicle and the Thomas brothers. He was aware of the powder marks on the inside of the vehicle; he did not know about the pellets being fired from inside the Brumfield vehicle until at trial. He had not been told about marks to the window. Mr. Pinkston admitted that he never tried to personálly see 1 Rthe vehicle. He did not know about Stanley’s statement to Detective Patterson; therefore, he did not question the detective about that statement.
Mr. Pinkston admitted that he filed a motion to have John Thomas’ car returned to him because Mrs. Thomas asked him to file the motion. When Mr. Pinkston was questioned about Mr. Kohnke’s actions to stop his objections during trial, he conceded that he considered Mr. Kohnke lead counsel on the case; he was brought in a month or two before trial. Mr. Kohnke was much more familiar with the case. Mr. Pinkston said that he felt that he was representing three brothers; of course he was being paid to represent Michael. He claimed that he did not receive Mr. Kohnke’s motion for a new trial, which blamed Michael for the incident. He stated that after he paid $4,000 for a copy of the trial transcript, Mrs. Thomas did not have money to hire two attorneys for two appeals. He said: “Now, maybe there was a conflict of some kind but that’s what I did.” He did not get signatures from the three defendants waiving any conflict. He clarified .that he found out about Mr. Ruiz’s statement during trial; however, the State never turned over that statement to the defense. Mr. Pinkston said that he had a unified strategy to claim self defense once he learned that Brumfield had a gun. He did not want Michael to testify because Stanley was more articulate.
Defense counsel asked that the trial court conduct an in camera inspection of the State’s file including all the police reports. The trial court stated that it would consider the request.
Defense counsel attaches an affidavit (dated February 28, 1999) in which John Thomas declares that he was with Michael on the night of the Brumfield shooting. Stanley was in the other side of the double. Michael did not leave the house after dark until the Brumfields arrived. John stated that he did not loan his 13black Camaro to Michael that night; Michael did not drive the car until after the shooting. During the shooting Stanley was armed with an AK-47, which was found to be the weapon from which the fatal shot was fired. John stated that he was the smallest in stature of the three brothers.
CLAIM 1
BRADY VIOLATION AND THE STATE’S BURDEN TO NEGATE SELF DEFENSE
The defendant claims that the State withheld evidence favorable to the defen *1122 dant. He lists five statements and/or items of evidence which were not disclosed to defense counsel:
1) Mr. Ruiz’s statement noted in a police report that the old man (Stanley Brumfield) shot back once;
2) Detective Patterson’s report stated that there were birdshot marks on the inside of the passenger window which indicated that someone fired from inside, but the low velocity of the shot caused it to fail to penetrate the window;
8) Stanley Thomas’ statement to the police that Michael was not involved;
4) Numerous bullets and shells found in the possession of Stanley Brumfield, Nicole Brumfield, and Demetrius Franklin at the hospital; Stanley Brumfield had a .22 caliber gun in his possession; and
5) A .22 caliber hole in the safety vest confiscated from Michael Thomas.
To comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence which is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Phillips, 92-1063 (La.App. 4 Cir. 2/29/96), 670 So.2d 588, writ denied 96-2131 (La.9/5/97), 699 So.2d 85. Included in this rule is evidence, which impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). J^The prosecutor is not required to deliver his entire file to defense counsel; he is required only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment. State v. Rosiere, 488 So.2d 965, 970 (La.1986); State v. Cager, 97-1877 (La.App. 4 Cir. 3/24/99), 732 So.2d 97, writ denied, 99-1161 (La.10/1/99), 748 So.2d 433.
The test for determining materiality was first established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, in Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court recently outlined the considerations for determining whether allegedly-suppressed evidence is material. These considerations were summarized in a recent decision by the Louisiana Supreme Court, State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819:
The issue is whether the exculpatory evidence is material under the Brady-Bagley-Kyles line of cases. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. [United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) ]. [The reviewing court] must provide a cumulative evaluation of the suppressed evidence, keeping in mind that [the defendant] does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. [The defendant] need only show that “disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.” ' Kyles, 115 S.Ct. at 1569. State v. Marshall, 94-0461, pp. 19-20, 660 So.2d at 826.
State v. Guy, 97-1387 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, quoting State v. Lindsey, 98-1064, pp. 2-3 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, 545-546.
At the hearing Mr. Pinkston testified that he knew prior to trial about Ronald Ruiz’s statement that Stanley Brum-field had shot back. He stated that Mrs. |nThomas had told him; the brothers had not mentioned the statement, and the State had not provided it. The defendant attaches a one page excerpt from a police report allegedly produced by the State *1123 after the evidentiary hearing. In his statement Mr. Ruiz said that Michael fired once at Mr. Brumfield, then there were some other shots, and then Mr. Brumfield shot back once. When Mr. Ruiz testified at trial, he clearly stated that he did not see anyone fire a gun prior to the time that Michael Thomas fired his weapon. He and the other witnesses heard one shot and then rapid gunfire erupted. The defendants certainly knew whether Mr. Brumfield had fired at Michael first, and Michael knew whether a bullet had hit his vest. Michael Thomas could have provided that information to defense counsel. Mr. Ruiz’s statement would not have helped the self defense strategy.
The defendant attaches an excerpt from a police report (that was- not turned over pre-trial) relating to Joyce Brumfield’s statement that the little gun (the .22 caliber weapon) was in Mr. Brumfield’s pocket when he arrived at the hospital and it fell out. Mr. Pinkston testified that he was not provided that information by the State, but he was aware that Mr. Brumfield had a .22 caliber gun when he entered the hospital because he talked to the nurses several days prior to trial. Although Mr. Pinkston does not directly say that he knew about the Brumfields’ ammunition, it would appear that his interview of the nurses days before trial may well have produced that information as well. The defendant attaches a report excerpt that Detective Patterson observed one exit shot at the front windshield, birdshot on the right passenger window, and powder burns on the back of the front seat, which seemed to indicate that a shotgun was fired, but the low velocity caused it to fail to penetrate the glass. Mr. Pinkston testified that he also knew that shots had been fired from inside the Brumfield vehicle; he was aware of the | ^powder marks. The fact that he did not know about pocked marks on the window would not have necessarily altered any trial strategy. Mr. Pinkston stated that after he discovered that Mr. Brumfield had a gun, his strategy was self defense for all three defendants. Stanley Brumfield was shot twice in the back prior to entering the car. His firing from the car at Michael could not prove self defense under the circumstances. The fact that Mr. Pinkston was not aware of Stanley Thomas’ statement that Michael was not involved is not helpful. At the evidentiary hearing Stanley clarified that he meant that Michael was not involved in the earlier shooting at the Brumfield house.
The defense has not shown that the disclosure of the withheld information would have made a different result reasonably probable. There is no merit to this claim.

CLAIMS 2 and 4

INEFFECTIVE ASSISTANCE OF COUNSEL BEFORE AND AT TRIAL; FAILURE TO SEVER DEFENDANTS FOR TRIAL
The defendant lists fifteen examples of ineffective assistance of counsel from asking very few questions during voir dire to failure to object to jury instructions on specific intent. The defendant claims that counsel was not prepared for trial, that he did not cross-examine Detective Patterson, who took Stanley’s exculpatory statement (of which he knew nothing)[2] or Demetrius Franklin, who was the only witness who allegedly saw the defendant when shots were fired by the Brumfield house earlier that night. The defendant alleges that he either did not cross examine or conducted limited cross examinations of several other State | ^witnesses. He claims that counsel should have requested a mistrial during closing argument when he objected to the prosecutor’s comments. The defendant argues that counsel was ineffective by failing to move to sever his case from that of his brothers.
*1124 Such a claim is assessed by the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438 (La.10/16/95), 661 So.2d 1333 (on rehearing). In order to prevail, the defendant must not only show that counsel’s performance was deficient, but also that he was prejudiced by the deficiency. Brooks at p. 6, 661 So.2d at 1337. The defendant must prove both elements to establish that his attorney was so ineffective as to require reversal. State v. Hongo, 96-2060, p. 5 (La.12/2/97), 706 So.2d 419, 422. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland at 686,104 S.Ct. at 2064. To carry this burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 693,104 S.Ct. at 2068.
State v. Robinson, 98-1606 p. 5 (La.App. 4 Cir. 8/11/99), 744 So.2d 119 quoting State v. Causey, 96-2723 (La.App. 4 Cir. 10/21/98), 721 So.2d 78, 84-85.
The defendant points to the lack of or limited cross-examination by counsel; however, such decisions are usually considered strategy. If an alleged error falls “within the ambit of trial strategy,” it does not “establish ineffective assistance of counsel.” State v. Bienemy, 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a .tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Bordes, 98-0086 (La.App. 4 Cir. 6/16/99), 738 So.2d 143.
The defendant also claims that the counsel failed to move for a mistrial when the prosecutor made improper comments during closing argument:
[W]hat did we keep presenting to you? The facts of the case. The central facts, but did you hear any — any testimony to rebutt [sic] the fact—
At that point defense counsel objected and the prosecutor continued:
— that Nicole and Stanley Brumfield - I’m sorry, Joyce and Stanley Brumfield went around this corner and got shot in a Suburban? Did you hear any testimony to rebutt [sic] the fact that Nicole and Demitrius Franklin got shot in that Suburban? Any testimony at all? Did you? Anybody? Did you? No. You know what you heard, you heard the waters .being muddied up by high priced attorney gimmicks. That’s what you heard. That’s what you saw, a lot of high priced attorney gimmicks.
At that point counsel for the other two Thomas brothers addressed the court. The prosecutor went on to start his next sentence. Counsel again addressed the court. The trial court sustained the objection and told the prosecutor to “refrain from going through this.” The prosecutor continued: “But, you heard, you heard no testimony to rebutt [sic] the facts....” Later on the prosecutor made a reference to the defendant’s eight hundred dollar suits, but the objections of both defense attorneys were overruled. Later on in the prosecutor’s closing argument he stated that Stanley Brumfield was dead, but that the jury “as people of this community, as citizens, as jurors, is [sic] convict the three men that did it to him.” Within a sentence the prosecutor noted that the defendants “weren’t wearing suits that day and neither was I — ■” Michael’s defense counsel objected, but the trial court never ruled. The prosecutor continued with his argument. None of the comments were |1Bnoted in the appeal whether or not objections were made or mistrials were requested.
*1125 If the prosecutor makes a direct reference to the defendant’s failure to testify, a mistrial should be declared, regardless of the prosecutor’s intent. State v. Johnson, 541 So.2d 818, 822 (La.1989). But when the prosecutor’s reference is not direct, the reviewing court inquires into the remark’s “intended effect on the jury” to distinguish between impermissible indirect references to the defendant’s failure to testify and permissible general statements that the prosecution’s case is unrebutted. Id. See also State v. Smith, 433 So.2d 688, 696-97 (La.1983) (prosecutor’s comments actually related to lack of evidence).
State v. Langley, 95-1489 (La.1998), 711 So.2d 651, 660 (rehg. granted in part on other grounds). In order for an indirect reference to mandate a mistrial, the State must have intended to draw the jury’s attention to the defendant’s failure to testify. State v. Burkhalter, 428 So.2d 449 (La.1983); State v. Ward, 96-1588 (La.App. 4 Cir. 3/4/98), 712 So.2d 139, writ denied, 98-1072 (La.10/9/98), 726 So.2d 17; State v. Clay, 612 So.2d 266 (La.App. 4th Cir.1992). If the prosecutor’s intention was to emphasize that the State’s case was unrebutted and that there were witnesses other than the defendant who could have testified on behalf of the defense but did not, the comment does not constitute an indirect reference to the defendant’s failure to testify. State v. Johnson, 541 So.2d 818 (La.1989). If the defendant was the only witness who could have rebutted the State’s case, then a reference to the fact that the case was uncontroverted focuses the jury’s attention on the defendant’s failure to testify. Id. at 822; State v. Smith,, 97-1546 (La.App. 4 Cir. 6/9/99), 740 So.2d 714.
The prosecutor’s indirect com-mentís) on the defendant’s failure to testify would not have appeared to mandate a mistrial if counsel had requested one. The prosecutor was talking about the victims being shot in the Suburban. Whether they LfiWere shot running away from the Thomas brothers (which was seen by Mr. and Mrs. Ruiz’s family) or in the Suburban parked around the corner was not determinative of the defendant’s guilt.
The defendant appears more concerned about the prosecutor’s comments about his high-priced attorney’s gimmicks and tactics. The defendant’s counsel objected after the worst comments; his objection was eventually sustained, and the prosecutor was told to refrain from the comments.
The defendant also contends that his counsel was ineffective because he did not move to sever his case. The defendant claims that the issue is not whether there were antagonistic defenses, but that he was prevented from presenting any defense because: he could not cross-examine his brothers/co-defendants about his alibi that he was at home when the shooting by the Brumfield house occurred; he could not question Stanley about the exculpatory statement he made that Michael was not involved; he could not question his brothers regarding his lack of intent and the reason he was wearing a bullet proof vest.
Jointly indicted defendants shall be tried jointly unless (1) the state elects to try them separately; or, (2) on motion of defendant, the court, after contradictory hearing, is satisfied that justice requires a severance. La.C.Cr.P. art. 704. A defendant is required to show by convincing evidence that a severance is or was required. State v. Tate, 95-0929, p. 2 (La.App. 4 Cir. 6/7/95), 657 So.2d 567, 568, writ denied, 95-1726 (La.9/1/95), 658 So.2d 1262.
State v. Brooks, 98-0693, p. 7 (La.App. 4 Cir. 7/21/99), — So.2d —, —, 1999 WL 562029. Under the “antagonistic defenses” test a severance is mandated when each defendant intends to blame the other; a joint trial would require the defendants to defend against the State and each other. State v. Prudholm, 446 So.2d 729. See also La.C.Cr.P. art. 704, comment (c). When each statement involves both defendants as principals and only the extent of participation is contradictory, the *1126 |17defenses are not antagonistic. The degree of blame each defendant seeks to cast on the other does not warrant a severance. State v. Williams, 416 So.2d 914 (La.1982); State v. Burton, 96-1248 (La.App. 4 Cir. 12/9/98), 727 So.2d 518, unit denied, 99-0037 (La.4/30/99), 741 So.2d 11.
At the evidentiary hearing Stanley explained that the statement to Detective Patterson that Michael was not involved related to the earlier- shooting at the Brumfield house. According to the affidavit of John Thomas, he was with the defendant all night until the Brumfields arrived; his brother, Stanley, was in the other side of the house. He said that he did not loan his Camaro to the defendant that night. He declared that Stanley was armed with the AK-47, from which the fatal shot was fired. John also stated that he was the smallest of the Thomas brothers.
Mr. Kohnke, who represented the other two Thomas brothers, did not argue in closing that the defendant was the one who shot Stanley Brumfield. He did not claim that Stanley and John were innocent and the defendant was the shooter. He argued that the case was one of justifiable homicide. He mentioned self defense and claimed that the Thomas brothers were victims of Franklin just as the Brumfields were his victims. Mr. Kohnke claimed that Franklin lured the Brumfields over to the Thomas house. He noted that guns were fired inside the Brumfield Suburban and noted the powder burns on the back seat and the marks on the window. Counsel noted that Stanley and John had jobs, but inquired as to whether Franklin worked. He noted that Officer Gilbert observed a .22 caliber single shot revolver fall from Stanley Brumfield, a shotgun and shells in the van when he moved it, and an assault rifle (AK-47) being removed by a police officer from under the front seat of the Suburban. Mr. Pinkston did not argue that the |1sother two brothers were the killers. He noted that the Thomas house had been riddled with bullets thirty-three days before the Brumfields approached the front porch on New Year’s Eve. He argued that bullets from the Thomases’ AK-47 did not match the bullet found in Stanley Brumfield; however, the Brum-fields also had an AK-47. Michael’s counsel argued that the death was a justifiable homicide.
The defendant has not shown that he and his brothers had antagonistic defenses and that he was seriously prejudiced by the joint trial. Even if the defendant had been tried separately, his brothers could not have been forced to testify. U.S. Const, amend. V. He has not shown that there was a reasonable probability that if Mr. Pinkston had severed his case and his brothers had testified at his separate trial, that their testimony would have clearly affected the outcome of the case under Strickland.
The defendant lastly argues that his right to effective counsel is not subject to the harmless error analysis; even if it were considered under that analysis, the cumulative effect of the errors is not harmless. The errors cannot be considered structural defects, which defy the harmless error analysis and require automatic reversal. See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Applications for post conviction relief or a writ of habeas corpus involving trial errors (not structural errors) must be decided by determining whether the error “had substantial or injurious effect or influence in determining the jury’s verdict,” id. at 1722, not by using the harmless beyond a reasonable doubt standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), used in appeals. Brecht, 113 S.Ct. at 1717.
Ineffective assistance of counsel claims are considered under the standard enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The [19defendant has not shown that there is a reasonable probability that, but for his counsel’s unprofessional errors, the result of the proceeding would have been different. He has not shown that the errors discussed above were sufficient to under *1127 mine confidence in the outcome of the jury. These claims lack merit.

CLAIM 3

INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL
The defendant argues that he was denied effective counsel on appeal because Mr. Pinkston represented all three Thomas brothers; he raised frivolous issues on appeal and issues that had not been preserved for appeal, but did not assign as error claims relating to prosecu-torial misconduct, jury instructions, and the denial of the defendant’s motion for a new trial as well as not seeking rehearing at this Court or writs at the Louisiana Supreme Court.[3] The defendant claims that Mr. Pinkston should have raised the issues of the Brady violations, the improper jury instruction on collective intent, the right to present a defense (nullified by the joint trial), and the denial of the motion for a new trial. These arguments merit serious consideration.
This right to counsel [on appeal] is limited to the first appeal as of right, see Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), and the attorney need not advance every argument, regardless of merit, urged by the appellant, see Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). But the attorney must be available to assist in preparing and submitting a brief to the appellate court, Swenson v. Bosler, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 (1967) (per curiam ), and must play the role of an active advocate, rather than a mere friend of the court assisting in a detached evaluation of the appellant’s claim. See Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); see also Entsminger v. Iowa, 386 U.S. 748, 87 S.Ct. 1402, 18 L.Ed.2d 501 (1967).
Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 835, 83 L.Ed.2d 821 (1985). Meaningful access has been held to include a right to court appointed counsel on a first direct appeal as of right and effective assistance of counsel. State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213.
When he was questioned about obtaining the trial transcript for Mrs. Thomas, Mr. Pinkston stated that she could not afford to hire two attorneys for two appeals. He had testified that he thought he was representing three brothers at trial even though he was being paid to represent Michael. Mr. Pinkston said that he did not obtain any signatures waiving any conflict of interest in fight of the fact that Mr. Kohnke had filed a motion for a new trial, which attempted to place the blame on Michael.[4] Mr. Pinkston claimed that he had not received a copy of the motion for a new trial.[5] He stated: “[M]aybe there was a conflict of some kind but that’s what I did.”
Mr. Pinkston assigned three errors on appeal: 1) insufficiency of the evidence in fight of their claim of self defense; 2) the State’s comment that deadly force could be used only against deadly force to be justifiable; and 3) the identification of John and Stanley Thomas was tainted. The second assignment of error was meritless because trial counsel did not request a mistrial or even object to the State’s comment in one instance. The third assignment of error *1128 was totally baseless because Mrs. Brum-field never identified the two Thomas brothers. | ¡^However, in the first assignment Mr. Pinkston argued on behalf of Michael Thomas that the jury could not have reasonably concluded that Stanley and John Thomas acted in the heat of passion, but Michael Thomas did not. That assignment was also found to lack merit. Mr. Pinkston raised the claim of insufficiency of the evidence as to all three defendants and the claim as to the jury’s conclusion that Michael did not act in the heat of passion on his behalf. This assignment also lacks merit. Additionally, Mr. Pinkston did in fact file a writ application on behalf of Michael Thomas at the Supreme Court, which was denied (93-K-1941).

CLAIM 4

JOINT TRIAL
The defendant argues that the joint trial of the defendant and his two brothers prevented him from exercising his right to present a defense. This argument was included in the ineffective assistance of counsel argument in claim 2 and discussed there.

CLAIM 5

JURY INSTRUCTION ON SPECIFIC INTENT
The defendant claims that the jury instruction on specific intent was erroneous; the instruction as to “the collective nature of intent” rather than the required individual proof of intent was reversible error. The judge instructed the jury as follows:
Thus, in order to convict the defendants of first degree murder, you must find that the defendants killed Stanley Brumfield and that the defendants acted with specific intent to kill or to inflict great bodily harm and that the defendants created risks of death or great bodily harm to more than one person.
Criminal intent in this case must be specific. Specific criminal intent is that state of mind which exists when the circumstances | ^indicate that the defendants actively desired the proscribed criminal consequences to follow their act or failure to act.... Applying criminal intent to the present case to convict the defendants of first degree murder, the State must prove beyond a reasonable doubt that the defendants killed Stanley Brumfield with a specific intenting [sic] of killing or inflicting great bodily harm upon more than one person.
Or, stated another way, the State is required to show beyond a reasonable doubt that the defendants committed the killing and that they knowingly created a risk of danger or great bodily harm to more than one person.
The defendant concedes that no objection was made to the instruction; the lack of an objection was noted in the ineffective assistance of counsel claim. The issue, of course, was not raised on appeal. The defendant contends that the conviction was obtained in violation of his constitutional rights because of the improper instruction, and the issue should be considered on post conviction relief under La.C.Cr.P. art. 930.3(1). The defendant cites Flowers v. Blackburn, 779 F.2d 1115, 1118 (5 th Cir.1986), cert. denied, 475 U.S. 1132, 106 S.Ct. 1661, 90 L.Ed.2d 204 (1986), but in that case the State did not raise the issue of the procedural bar.
Regardless, the instruction here did not contain the law of principals as did the instruction in State v. West, 568 So.2d 1019 (La.1990)(cited by the defendant); this instruction requires the defendants to have specific intent to kill or cause great bodily harm. There was no possibility that the jury members could have believed that a defendant’s specific intent to kill could have been implied from knowledge of a coconspirator’s intent. The use of the plural in the instructions in West involved the discussion of principals, not just a require *1129 ment that the defendants have specific intent.
The defendant does not allege that he requested an instruction on principals or an instruction which stated that “each defendant” must have ^specific intent. The use of the plural “defendants” rather than stating that “each defendant” must have the specific intent is not clearly erroneous. Additionally, if the instruction were considered to constitute error, the error was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 18, 87 S.Ct. at 824. The use of plural defendants with specific intent did not contribute to defendants’ convictions. If the instruction is considered an error, it was unimportant in relation to everything else the jury considered as seen in the record. State v. Smith, 600 So.2d 1319 (La.1992).
This claim lacks merit.

CLAIMS 6 AND 7

CONFLICT OF INTEREST
The defendant claims that Mr. Pinkston had an actual conflict of interest.
Multiple representation does not presumptively result in the ineffective assistance of counsel so as to violate constitutional guarantees unless it gives rise to a conflict of interest. State v. Kahey, 436 So.2d 475 (La.1983). Where there has been no objection to the multiple representation prior to or during trial, a defendant must show an actual conflict of interest adversely affected his attorney’s performance in order to establish a claim of ineffective assistance of counsel in violation of the Sixth Amendment. State v. Lobato, 603 So.2d 739 (La.1992). See also Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). If the defendant fails to raise the. issue until after trial, he must prove prejudice in addition to actual conflict of interest. State v. Montegut, 618 So.2d 883 (La.App. 4 Cir.1993), writ denied, 626 So.2d 1177 (La.1993).
An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. Zuck v. Alabama, 588 F.2d 436 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and l^the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.
588 F.2d at 439. When there is such a conflict of interest, the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, a denial of effective representation exists without a showing of specific prejudice. Castillo v. Estelle, 504 F.2d 1243, 1245 (5th Cir.1974). See also Zuck v. Alabama, supra, 588 F.2d at 436. A reviewing court cannot, however, presume that joint representation and the possibility of a conflict has resulted in ineffective assistance of counsel. Multiple representation may even be desirable for a particular defendant as a means of insuring against reciprocal recrimination in cases “where a common defense gives strength against a common attack.” Glasser v. United States, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942), Frankfurter, J., dissenting.
State v. Kahey, 436 So.2d at 485.
There was no apparent multiple representation here. Mr. Pinkston represented Michael Thomas, and Mr. Kohnke *1130 represented Stanley and John Thomas at trial. The defense of all the three brothers appeared to be justifiable homicide or self defense. In closing argument Mr. Kohnke did not argue that Michael was the perpetrator and his clients were innocent. Mr. Pinkston did not argue that the other two brothers, but not Michael, were the perpetrators. All three Thomas brothers had guns; their defense did not involve denying that fact.
The defendant notes that Mr. Pinkston testified that he believed that he was representing all three defendants at trial; however, he stated that he was being paid to represent Michael Thomas. In his closing argument he did not clearly argue just Michael’s case. However, the defense of all three was the same. The defendant has not shown that the alleged conflict of interest prejudiced him at trial.
[¡«Mr. Pinkston represented the defendant at trial and on appeal. The defendant was not prejudiced by the fact that his counsel also represented his brothers on appeal. Mr. Pinkston argued sufficiency as to all three defendants, and argued on behalf of Michael that he too should have been convicted of manslaughter. The defendant has not shown that he was prejudiced on appeal.
These claims have no merit.
For the foregoing reasons, we grant the application and affirm the trial court’s denial of the defendant’s application for post conviction relief.
WRIT GRANTED; AFFIRMED.

. The defendant does not provide the transcript or the minute entry of April 16, 1999. The docket master entry indicates that the application was denied. Apparently, there are no reasons for judgment.

. Note that in his first claim the defendant argues that the State did not turn over the statement. Now he argues that the trial court conducted an in camera inspection and ordered that the statement be turned over; counsel was not present in court, but he could have discovered the information buy mere examination of the record.

. Contrary to this allegation, the record contains a writ application filed by Mr. Pinkston for Michael Thomas at the Supreme Court; counsel alleged that this Court erred by finding that the evidence was sufficient to show premeditation. The Louisiana Supreme Court denied the writ State v. Michael Thomas, 93-K-1941 (La.1993), 625 So.2d 1062.

. John and Stanley Thomas would have been the ones to sign a waiver; Mr. Pinkston had been Michael’s attorney at trial.

.The defendant does not attach a copy of the motion for a new trial filed by Mr. Kohnke on behalf of Stanley and John Thomas. The motion in the record alleges that Michael "alone, instigated and was solely responsible” for the victim’s traveling to the Westbank to his house. Michael’s actions one hour before caused the confrontation; Stanley and John’s actions were justified since bullets had been shot at their house during Thanksgiving.