|, KLEES, Chief Judge.
By bill of information dated January 14, 1997, defendant Lon Washington was charged with seven Counts of armed robbery (Counts 1, 7, 11, 12, 13, 14, and 15), three Counts of attempted armed robbery (Counts 2, 3, 8), and three Counts of attempted first degree murder (Counts 16, 17, 18). Defendant Darnell McNeil was charged with five Counts of armed robbery (Counts 7, 12, 13, 14, 15), three Counts of attempted armed robbery (Counts 2, 3, 8), and two Counts of attempted second degree murder (Counts 4 and 9). Both defendants pleaded not guilty. On September 25-26, 1997, Washington and McNeil were tried together with separate twelve-member juries deciding their cases on Counts 2, 3, 4, 7, 8, 9, 12, 13, 14, and 15. As to Washington, the jury found him guilty of five Counts of armed robbery (Counts 7, 12, 13, 14, and 15) and one Count of attempted armed robbery (Count 8). As to McNeil, he was found guilty as charged of four Counts of armed robbery (Counts 12, 13, 14, and 15) and two Counts of attempted armed robbery (Counts 2 and 3). On November 26, 1997, the trial court denied Washington’s and'McNeil’s motions for new trial and sentenced them the same day. Washington was sentenced on Counts 7 and 8 to forty-nine and one-half years without benefit of parole, probation, or suspension of sentence to run concurrently with each other | ¡>and on Counts 12, 13, 14, and 15 to fifty years at hard labor without benefit of parole, probation, or suspension of sentence to run concurrently with each other but consecutively to the sentences on Counts 7 and 8. The State filed a multiple bill to which Washington admitted his identity; and, after advising Washington as to his rights, the trial court found him to be a second offender. The court vacated his sentence on Count 12 and resentenced him to fifty years at hard labor without benefit of parole, probation, or suspension of sentence. McNeil was sentenced on Counts 2 and 3 to forty-nine and one-half years at hard labor without benefit of parole, probation, or suspension *942 of sentence to run concurrently with each other and on Counts 12, 13, 14, and 15 to fifty years at hard labor without benefit of parole, probation, or suspension of sentence to run concurrently with each other and consecutively to the sentences on Counts 2 and 3. The trial court denied both defendants’ motions for reconsideration of sentence. This appeal followed.
A review of the record reveals no errors patent.

STATEMENT OF THE FACTS

This case involves four separate robbery incidents. This first one occurred on October 23, 1996. Janet Gibson testified that she and her boyfriend, Jimmy Rezny, were returning home from the hospital; and, when she was two blocks from her house, she realized that a car was following her. She parked in front of her house, and the car that had been following her pulled up and blocked her in. A man jumped out, put a gun to her and Rezny, and ordered them out of the car. Ms. Gibson testified that she asked Rezny what to do and he told her to start honking the horn. When she did so, the man with the gun shot her twice. She threw herself over her two month old baby who was also in the car. She stated that the armed man was of medium height, but she was unable to otherwise describe him because | ahe wore a blue bandana over his face. Rezny testified that three men got out of the car and that they wore Halloween masks and bandanas.
The next incident occurred on November 5, 1996. Kimberly Waters testified that she and Alex Curtis were driving up to her house on Pitt Street when another car pulled up alongside her car. She saw two men with guns jump out, and she said that each one went on either side of her car. Ms. Waters and Curtis exited the car; and, when one of the men, who had a gun against her chest, reached for her purse, Ms. Waters begged him not to take it because it was her birthday. She then heard gunfire and realized she had been shot three times, once in the chest and twice in the left leg. She testified that the men wore bandanas over their faces and that she was unable to make an identification from pictures that were shown to her in the hospital.
Curtis testified that a man with a gun ordered him out of the car and onto the ground. He further testified that the man held the gun to the back of his head, demanded money, and felt around his body. He heard Ms. Waters yelling that it was her birthday, and he testified that the man who had the gun on him fired at Ms. Waters. Curtis testified that one of the men had a bandana covering one eye. The men ran into their car, which Curtis said he could hear driving closer to them. He also stated that he was not able to positively pick anyone out of two photographic lineups although he was sixty to seventy-five percent sure that one of the persons in one of the lineups was one of the robbers.
The third incident occurred in the early morning of November 13, 1996. Brenda Gallardo testified that Navin Agrawal and Aaron Chad Alvarez were dropping her off at her house at 7735 Zimple Street when another car pulled up beside Agrawal’s car. She further testified that a man in the other car pointed a 14shotgun out of the window and ordered her and the others out of the car. Ms. Gallardo and her friends exited the car, and she testified that three men got out of the other car and surrounded them. She also stated that two of the men wore masks and one wore a bandana and that another man stayed in the car. The three men demanded Ms. Gallardo’s purse and jewelry, which she gave to them; and, one of the men threw Agrawal to the ground. The men took Agrawal’s and Alvarez’s wallets and watches, and the man with the shotgun kept the weapon pointed at Ms. Gallardo’s chest. The men left when they heard a car coming. She testified that the man who approached her wore a blue, yellow and white football jacket and an “old man” mask. She identified a Michigan jacket and mask as that worn by the man who *943 robbed her. She also identified a Loyola University identification card that belonged to Alvarez. After the police arrived, Ms. Gallardo, Agrawal, and Alvarez were taken to an accident scene on Washington Avenue. Ms. Gallardo testified that she identified Washington and McNeil by their clothing as two of the men who robbed her and her friends.
Agrawal testified that the three men, two wearing Halloween masks and the other a bandana, dragged him, Ms. Gallardo, and Alvarez out of the car; and, one of the men held a gun to his head and ordered him to kneel down. He also stated that he was unable to make an identification because the robbers wore masks and he was on the ground. Agrawal gave the man his wallet. Both Ms. Gallardo and Agrawal testified that the robbers were in a gray car and that Alvarez got the license plate number of the car. He identified the car at the crash site on Washington Avenue as the car that the people who robbed them exited. Alvarez did not testify at trial.
IsThe fourth robbery also occurred on November 13, 1996, at around 3:00 a.m. Ansel Mullins testified that he was returning from work to his home at 7407 Freret Street when he heard a car pull up and stop. He saw some men, one of whom had a sawed-off shotgun and wore an old man’s rubber mask, jump out of the car and approach him. They demanded money, but Mullins told them he had no money, only a beeper. The men rifled through Mullins’ pockets, took the beeper, and left. Mullins entered his house and called the police; and as he spoke with the police, he saw the robbers’ car going the wrong way down Freret. He stated that the man with the gun wore blue and yellow Michigan jacket and that he was taller than the other two men.
Officer Winston Parker testified that he responded to a call about a robbery at Burdette and Zimple Streets and that he had been given a description of the vehicle involved in the robbery. He said that he saw the vehicle, an Oldsmobile with the license plate number DLK 917, and followed it for a short distance before going to the scene of the robbery. He stopped pursuing the vehicle because there were other police vehicles pursuing it. He said that he later took the robbery victims to Washington Avenue and met with Detective Herman Cade, who interviewed the victims and had them view several people who had been arrested after the Oldsmobile collided with a police car.
Officer Byron Corley testified that he responded to the call of a robbery in the 7400 block of Freret and met with the victim, Ansel Mullins. He stated that he had been on his way to respond to the call of the robbery on Zimple and was on Freret when he saw the two individuals getting into a vehicle that had been described as the one involved in the Zimple Street robbery. Corley said that this vehicle fled at a high rate of speed and that he pursued it at a safe distance. He | fialso said that he took Mullins to the scene of the collision and met with Detective Cadei
Detective Herman Cade testified that he participated in the chase of the robbery suspects and that after the suspects were arrested, he met with the victims. He stated that he took each of the victims to the police cars in which Lon Washington, Darnell McNeil, Bernell Toney, and Lehman Hannon were being held. A female, Tayari Gant, was also arrested. He stated that Ms. Gallardo and Mullins identified McNeil, that Agrawal identified Washington, and that Alvarez identified Toney. He also stated that they identified the car and a shotgun that was found in the backseat. Cade testified that a bandana was found on the front seat, a mask was found in the backseat, and a nine millimeter Llama semi-automatic was found underneath the police car that had collided with the suspects’ car at 2709 Magnolia Street.
Lieutenant Tim Bayard testified that on November 13, he participated in a chase of robbery suspects in a silver Oldsmobile 98. He stated that on Magnolia near Washing *944 ton there was an accident involving the occupants of the Oldsmobile and two other police officers and that there was then a foot chase with the occupants of the Oldsmobile. Bayard stated that he pursued one suspect, whom he identified as Darnell McNeil, whom he said wore blue jeans and a Michigan Wolverines jacket and had a chrome nine millimeter gun in his right hand. Bayard further stated that McNeil ran straight at him and that he ordered McNeil to drop his gun. When McNeil raised his gun, Bayard fired at him three times; and, McNeil ran onto Washington Avenue and into the Magnolia Housing Project via Clara Street. Bayard, along with two other officers, pursued McNeil; and, McNeil was apprehended on Willow Street and returned to Washington and Clara where 17Bayard identified him as the man he had pursued and at whom he fired his weapon. The nine millimeter handgun was found in some tall grass on Willow near a courtyard. He admitted that he did not actually see McNeil exit the Oldsmobile or discard the gun.
Officer Richard Bonnet testified that he participated in the pursuit of the Oldsmobile and that he saw the Oldsmobile collide with the police car. He also testified that he saw several individuals bail out of the Oldsmobile and that he pursued Bernell Toney and Lon Washington. He said that he exchanged gunfire with Washington and that Toney gave himself up as Washington continued to flee. Other officers chased Washington.
Officer Steve Williams testified that he joined the .pursuit of the Oldsmobile at Jefferson and Claiborne and that when the Oldsmobile collided with the police car, his car skidded past it. He also testified that as he exited his car, he saw McNeil raise his gun at Lieutenant Bayard and that he, Williams, fired at McNeil. He also testified that he investigated the shootings of Ms. Gibson and Ms. Waters. He admitted that he showed Curtis photographs of Kevin Gray and Darcel Jackson, whom he had developed as suspects, and that Curtis tentatively identified Gray as an assailant. Williams was later recalled as a witness and asked how he was able to tie the robberies to the two defendants. He referred to the report of Officer Kenneth Leary, a firearms examiner, who concluded that the casings from the shooting of Ms. Gibson matched those from the shooting of Ms. Waters and that they were shot from the Llama semi-automatic that was found at the scene of the collision.
Officer Stanley Morlier testified that he arrested Washington after pursuing him following the car crash. He stated that he found Alvarez’s Loyola Express [scard on Washington’s person. He also stated that Washington was wearing gloves at the time of the arrest, but he did not find a weapon.
Officer Kenneth Leary testified that he performed examinations of a nine millimeter casing and bullet recovered from the scene of the shooting of Ms. Gibson on Cohn Street and a nine millimeter copper jacket fragment, five nine millimeter cartridge cases, and one nine millimeter bullet recovered from the scene of the shooting of Ms. Waters on Pitt Street. He stated that he determined that they came from the nine millimeter Llama pistol that was recovered on November 13.
Bernell Toney testified that he was arrested with McNeil, Washington, and Lehman Hannon on November 13 and that they robbed four people that night. He stated that Washington was driving the car and that McNeil and Hannon jumped out of the car and robbed a man going to his door. He further stated that they took a pager from this man and that when they saw a police car, they got back into the car. Toney testified that prior to this robbery, McNeil and Hannon robbed three other people, two men and a woman, that night. He also testified that he never got out of the car that night and that only Hannon and McNeil exited the car to commit the robberies. He admitted that he was allowed to plead guilty to four counts of simple robbery and that the pager taken *945 from Mullins was found in his possession when he was arrested.
Detective Marco Demina testified that he arrested McNeil and took a statement from him after McNeil signed a rights of arrestee form. A tape of the statement was played, and a transcript of the tape was also given to the jury. He was questioned about the shooting of Janet Gibson; and, he stated that he, Washington, and Hannon followed her car. He further stated that Hannon gave him a gun and that Hannon shot Ms. Gibson. He also stated on the night of the [achase, Washington stopped the car and he, Hannon, and To-ney robbed two men and a woman. He said that they then robbed another man who was walking toward his door and took a pager.

ASSIGNMENT OF ERROR NO. 1 (BOTH DEFENDANTS)

In this assignment of error, both defendants complain that the trial court erred in denying their motion to sever the counts and their motion to be tried separately. They argued that they were prejudiced by the joinder of the different offenses because it was impossible for the jury to separate the elements and evidence as to the each of the offenses. They further argue that they were prejudiced by being tried together and that the use of separate juries to try them was confusing.
La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
La,C.Cr.P. art. 495.1 provides that if the defendant or the State is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial, the trial court may order separate trials, grant a severance of the offenses, or provide whatever other relief justice requires. The trial court is vested with much discretion in determining whether to grant a motion to sever, and its ruling should be upheld in the absence of an abuse of this discretion. State v. Johnson, 96-0950 (La.App. 4 Cir. 8/20/97), 706 So.2d 468, writ denied 98-0617 (La. 17/2/98),,n 724 So.2d 203. If the facts of each offense are not complex and there is little likelihood that the jury will be confused by the evidence of more than one crime, there is no prejudice and no need for a severance. State v. Lewis, 557 So.2d 980 (La.App. 4 Cir.1990), writ denied 578 So.2d 922 (La.1991).
It does not appear that the trial court abused its discretion in refusing to sever the offenses. The offenses were sufficiently similar, and the facts of each offense were simple and distinct. Clearly, the jurors were not confused and were able to consider the various offenses individually considering that the jurors returned not guilty verdicts as to some of the counts.
Defendants also complain that the trial court erred in refusing to sever their respective cases for trial. They argue that the use of dual juries resulted in confusion and an unfair trial. Jointly indicted defendants shall be tried jointly unless the State elects to try them separately or the trial court determines, on the defendant’s motion and after a contradictory hearing, that justice requires a severance. La.C.Cr.P. art. 704. The defendant must show by convincing evidence that a severance is warranted. State v. Tate, 95-0929 (La.App. 4 Cir. 6/7/95), 657 So.2d 567, writ denied 95-1726 (La.9/1/95), 658 So.2d 1262. The decision on whether to grant or deny a severance is within the sound discretion of the trial court, and the trial court’s decision will not be disturbed on appeal absent a clear abuse of discretion. State v. August, 96-2777 (La.App. 4Cir. 9/16/98), 719 So.2d 536, writ denied 98-2523 *946 (La.1/5/99), 736 So.2d 206. The standard for a severance prior to trial is broader because of speculation as to what the evidence will be, whereas the standard for a severance after trial is stricter because the trial court can examine the evidence. State v. Burton, 96-1248 (La.App. 4 Cir. 12/9/98), 727 So.2d 518, writ denied 99-0037 (La.4/30/99), 741 So.2d 11.
InDefendants cite State v. Watson, 397 So.2d 1337 (La.1981), in support of then-argument that the trial court should have severed their cases for trial rather than use dual juries to hear each of their cases at the same trial. In Watson, the defendant and another man, who had been separately billed, were tried for armed robbery at one trial with separate juries deciding their respective cases. Both men had given confessions, and each defendant’s jury was removed from the courtroom when the other defendant’s confession was introduced into evidence. The defendant complained that his jury actually discovered the other man’s confession and that this violated his right to confront the witness against him. The Supreme Court affirmed the defendant’s conviction, finding that he suffered no prejudice from the jury’s discovery of the other man’s confession because the confessions were so substantially identical or interlocking as to minimize the risk of prejudicial spillover incrimination that the lack of the ability to cross-examine is reduced to an insignificant level. The court also stated in conclusion that although it was not necessary to approve or disapprove the use of dual juries as a viable alternative to severance, such a procedure was not specifically authorized by the Code of Criminal Procedure. The court further stated that the procedure represented numerous physical and legal complications, the possible drawbacks of which would appear to argue against approval of the dual jury procedure in future cases. The court noted that the use of dual juries might suggest to the respective juries that the defendants should be treated differently or that one defendant may be more guilty than the other or more involved in the offense.
It does not appear that the trial court abused its discretion in not having completely separate trials for McNeil and Washington. Although the Supreme Court in Watson apparently disapproved of the practice, it does not appear that in |iathe present case that either defendant suffered prejudice. The jury deciding the case against Washington was removed from the courtroom when the State presented evidence of a statement made by McNeil implicating both him and Washington in the various offenses for which they were being tried. There has been no claim, as there was in Watson, that the other jury somehow learned of this incul-patory statement. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2 (MCNEIL)

In this assignment of error, McNeil complains that the trial court erred in denying his motion for a mistrial because of an impermissible reference to inadmissible other crimes evidence that the State elicited from Bernell Toney. A review of the trial transcript shows that the prosecutor asked Toney whether McNeil and Han-non were friends; and, after Toney answered in the affirmative, the prosecutor asked him if McNeil and Hannon had told him about “prior incidents that they had committed together.” After the trial judge sustained McNeil’s objection, the following transpired:
BY MR. GILLIE:
Q Do you have any knowledge of other incidents?
A No, sir.
Q Besides this one, the one that happened November 13th.
McNeil’s counsel objected and moved for a mistrial. The trial judge sought clarification of the question and asked the prosecutor if Hannon and McNeil had told him, meaning Toney, about some prior incident. After the prosecutor answered in the affir *947 mative, the trial judge sustained the objection.
113A mistrial is warranted under La.C.Cr.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant’s rights that even a jury admonition cannot provide a cure. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Potentially damaging remarks include direct or indirect references to other crimes committed or alleged to have been committed by the defendant, unless that evidence is otherwise admissible. La.C.Cr.P. art. 770(2). The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made; and, the comment must not arguably point to a prior crime and must unmistakably point to evidence of another crime. State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893. In addition, the imputation must unambiguously point to the defendant; and, the defendant bears the burden of proving that a mistrial is warranted. Id. An impermissible reference to another crime which is deliberately elicited from a witness by the prosecutor is imputable to the State. State v. Madison, 345 So.2d 485 (La.1977); State v. Whins, 96-0699 (La. App. 4 Cir. 4/9/97), 692 So.2d 1350, writ denied 97-1227 (La.11/7/97), 703 So.2d 1263.
It should be noted that the trial court did not specifically rule on McNeil’s request for a mistrial after sustaining the objection. Equating this failure to rule with a denial of the motion for mistrial, it does not appear that the trial court erred in denying the motion. Had McNeil been on trial for the November 13 robberies alone, then the questions asked of Toney would have directly referred to inadmissible other crimes evidence. But McNeil was being tried for other robberies as well, and the questions appear to be directed to the other offenses for which McNeil was being tried considering the prosecutor’s reference to the date of |uNovember 13. Also, Toney answered, “No,” when asked whether McNeil and Hannon talked about prior incidents. Thus, it does not appear that the prosecutor actually elicited testimony about inadmissible other crimes. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2 (WASHINGTON)

In this assignment of error, Washington complains that the State failed to present sufficient evidence of his guilt. He argues that as to Counts 7 and 8, the State failed to present any evidence that placed him at the scene, such as identifications of him by the two victims. He also makes this argument with regard to the other counts on which he was convicted.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
Washington was found guilty of both armed robbery and attempted armed robbery. Armed robbery is the taking of anything of value from the person of h,.¡another or that is in the immediate control of another by use of force or intimi *948 dation while armed with a dangerous weapon. La. R.S. 14:64. An attempt is defined in La. R.S. 14:27 A as:
Any person-who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
A principal is a person concerned in the commission of a crime, whether present or absent, and whether he directly commits the act constituting the offense, aids and abets in it commission, or directly or indirectly counsels or procures another to commit the crime. La. R.S. 14:24. Only those persons who knowingly participate in the planning or execution of the crime are principals, and mere presence at the scene is not enough. State v. Graves, 96-1537 (La.App. 4 Cir. 9/10/97), 699 So.2d 903; State v. Marshall, 94-1282 (La.App. 4 Cir. 6/29/95), 657 So.2d 1106.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012. This is not a separate test from Jackson v. Virginia, but is instead an evidentiary guideline for the jury when considering circumstantial evidence and facilitates 11fiappellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984); State v. Addison, 94-2431 (La.App. 4 Cir. 11/30/95), 665 So.2d 1224.
There is merit to Washington’s argument that the evidence does not prove his guilt beyond a reasonable doubt as to Counts 7 and 8. Although the evidence shows that these offenses were similar to the other robberies as to which the State presented sufficient evidence of Washington’s guilt, there is no evidence showing that he was one of the participants in the robbery of Ms. Waters and Curtis. Neither victim was able to identify him, and there was no other evidence linking him to those counts. As to the other counts of armed robbery, the State proved defendant’s guilt beyond a reasonable doubt. He was seen fleeing the car that had been identified by the victims as that of the robbers and that car had been in a high speed chase with the police shortly after those robberies were committed. Accordingly, this assignment of error has merit as it pertains to Counts 7 and 8, but not as to the other counts.

ASSIGNMENT OF ERROR NO. 3 (BOTH DEFENDANTS)

In this assignment of error, both defendants complain that the trial court erred in imposing excessive sentences. They both argue that the sentences are disproportionate to the severity of the crimes and impose needless pain and suffering and that the trial judge did not pay sufficient attention to their backgrounds.
Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is |17nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 *949 So.2d 739 (La.1992); State v. Telsee, 425 So.2d 1251 (La.1983).
A reviewing court must determine whether the trial judge adequately-complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances. State v. Soco, 441 So.2d 719 (La.1983); State v. Anderson, 97-2587 (La.App. 4 Cir. 11/18/98), 728 So.2d 14. If adequate compliance with Article 894.1 is found, the reviewing court must then determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982). The trial judge has wide discretion in sentencing, and a sentence should not be set aside absent the manifest abuse of that discretion. State v. Sweeney, 443 So.2d 522 (La.1983).
In sentencing Washington, the trial judge referred back to comments he made when he sentenced Lehman Hannon earlier in the same sentencing hearing. The judge also stated that Washington, like Hannon, was involved in a reign of terror and preyed upon other people. The judge reiterated the facts of the offenses and noted that Washington was on probation for another offense at the time the offenses in the present case were committed. The judge stated that this case involved a very serious and very dangerous episode with some very dangerous individuals and that it was very difficult to have any sympathy or compassion for people who go out and place guns on other people and shoot other people. The judge further stated that Washington was in need of correctional treatment and that any lesser sentence would deprecate from the seriousness of the charge.
|1sAs to McNeil, the trial judge stated that he ordered a presentence investigation and noted that the probation department indicated that a “significant” sentence should be imposed although it pointed to certain factors in McNeil’s background. The judge further stated that because of the violence that was displayed and the severe risk to innocent people, he had to reiterate that it was difficult for him to have any real sympathy for anyone involved in this sort of activity. The judge summarized the facts of the various offenses, and he stated that there had to be better judgment exercised. He also stated that he was sorry for McNeil’s background and situation, but that it did not take a great background to know that it was wrong to put a gun on another human being. He noted that if there had been any real remorse or sorrow, someone would have pulled out, but no one did. The judge stated that although McNeil had no prior record, he believed a significant sentence was appropriate because of the dangerous situation that was imposed on other people.
The trial judge did not abuse his discretion with regard to the sentences imposed on either Washington or McNeil. The trial judge gave sufficient reasons for the sentences he imposed on both defendants, and it is clear that he did not feel that any mitigating circumstances outweighed the aggravating circumstances, especially that of the offenses and the way in which they were committed. These assignments of error are without merit.
Accordingly, the convictions and sentences of Darnel McNeil are affirmed. As to Lon Washington, his convictions and sentences on Counts 7 and 8 are reversed, and his convictions and sentences on the remaining counts are affirmed.

\ ^AFFIRMED in part, reversed IN PART.